**IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF COLORADO**

Civil Action No.

ACACIA LYN-DARR,

           Plaintiff,

v.

JOHN PANNUNZIO, in his individual capacity,
DON LEACH, in his individual capacity,
JEREMY BACOR, in his individual capacity,
BYRON FRANKLIN, in his individual capacity,
TROY KOCHEVAR, in his individual capacity,
GREG PURKETT, in his individual capacity,
RONALD THURSTON, in his individual capacity,
LEROY MORA, in his individual capacity,
JC WILLIAMS, in his individual capacity,
PUEBLO COUNTY BOARD OF COMMISSIONERS,
PUEBLO COUNTY,
PUEBLO COUNTY SHERIFF'S OFFICE,
BRADLEY PRATT, in his individual capacity, and
CITY OF COLORADO SPRINGS,

           Defendants.

---

**COMPLAINT AND JURY DEMAND**

---

Plaintiff Acacia Lyn-Darr,[1] by and through her attorneys, respectfully alleges for her

Complaint and Jury Demand as follows:

---

[1] Plaintiff goes by Acacia Lyn-Darr. Her surname is written as "Lyndarr" throughout the documents in her underlying criminal case.

1

**INTRODUCTION**

1.      Plaintiff Acacia Lyn-Darr was wrongfully convicted of the 2009 murder of Robert Piserchio at his home in Pueblo, Colorado. She was sentenced to life in prison without the possibility of parole.

2.      From the start of their investigation into Piserchio's murder, Defendants targeted Plaintiff as a primary suspect and manufactured evidence against her. They began by coercing a female witness, who was nine months pregnant at the time, to falsely implicate Plaintiff over the course of four interviews and interrogations.

3.      At Plaintiff's 2012 trial, the only evidence placing her at the scene of the crime was the false testimony of Matthew Barnes. Barnes falsely implicated Plaintiff after a coercive, eight-hour interrogation in which, after Barnes repeatedly maintained his and Plaintiff's innocence, Defendant John Pannunzio and other Defendants supplied Barnes with the information forming the basis for every detail to which he purportedly "confessed."

4.      The individual Defendants knew Barnes's "confession" was obviously and demonstrably false. Barnes repeatedly purported to confess to details about the crime that Defendants knew to be untrue, and he corrected those errors only after Defendants gave him the correct information.

5.      At Plaintiff's criminal trial, the evidence connecting her or Barnes to the robbery and murder was virtually non-existent. No physical or scientific evidence connected either Plaintiff or Barnes to the scene of the murder nor to the murderer's vehicle, which the murderer had driven to and from the scene.

2

6.      On February 11, 2025, Plaintiff's convictions were vacated, and three months later, the State moved to dismiss the criminal case against her. The Pueblo County District Court granted that motion, dismissing her criminal case.

7.      As a result of Defendants' misconduct, Plaintiff spent more than eleven years unjustly incarcerated for a murder she did not commit.

8.      Plaintiff now seeks justice and accountability from Defendants for the harm they caused and redress for Plaintiff's loss of freedom resulting from their misconduct, as well as the pain and suffering that Plaintiff has endured and continues to endure to this day.

## JURISDICTION AND VENUE

9.      This Court has subject-matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1367 because this is an action arising under the Constitution and laws of the United States and because Plaintiff's state-law claims are part of the same case or controversy as the federal claims over which the Court has original jurisdiction.

10.      Venue is proper pursuant to 28 U.S.C. § 1391(b) because, on information and belief, one or more Defendants reside in this District and because a substantial portion of the events giving rise to the claims asserted occurred in this District.

## PARTIES

11.      Plaintiff Acacia Lyn-Darr is a citizen and resident of the State of Colorado. Plaintiff was falsely arrested for the murder of Robert Piserchio in 2010 and wrongfully convicted of that and related crimes in 2012.

12.      Defendant John Pannunzio, at all relevant times, was a sergeant in the Pueblo County Sheriff's Office acting under color of law and within the scope of his employment for

3

Pueblo County. On information and belief, Defendant Pannunzio resides in Colorado. Defendant Pannunzio is sued in his individual capacity.

13.    Defendant Don Leach, at all relevant times, was a captain in the Pueblo County Sheriff's Office acting under color of law and within the scope of his employment for Pueblo County. On information and belief, Defendant Leach resides in Colorado. Defendant Leach is sued in his individual capacity.

14.    Defendant Jeremy Bacor, at all relevant times, was a detective in the Pueblo County Sheriff's Office acting under color of law and within the scope of his employment for Pueblo County. On information and belief, Defendant Bacor resides in Colorado. Defendant Bacor is sued in his individual capacity.

15.    Defendant Byron Franklin, at all relevant times, was a detective in the Pueblo County Sheriff's Office acting under color of law and within the scope of his employment for Pueblo County. On information and belief, Defendant Franklin resides in Colorado. Defendant Franklin is sued in his individual capacity.

16.    Defendant Troy Kochevar, at all relevant times, was a detective in the Pueblo County Sheriff's Office acting under color of law and within the scope of his employment for Pueblo County. On information and belief, Defendant Kochevar resides in Colorado. Defendant Kochevar is sued in his individual capacity.

17.    Defendant Greg Purkett, at all relevant times, was a detective in the Pueblo County Sheriff's Office acting under color of law and within the scope of his employment for Pueblo County. On information and belief, Defendant Purkett resides in Colorado. Defendant Purkett is sued in his individual capacity.

18.    Defendant Ronald Thurston, at all relevant times, was a detective in the Pueblo County Sheriff's Office acting under color of law and within the scope of his employment for Pueblo County. On information and belief, Defendant Thurston resides in Colorado. Defendant Thurston is sued in his individual capacity.

19.    Defendant Leroy Mora, at all relevant times, was a sergeant or lieutenant in the Pueblo County Sheriff's Office acting under color of law and within the scope of his employment for Pueblo County. On information and belief, Defendant Mora resides in Colorado. Defendant Mora is sued in his individual capacity.

20.    Defendant JC Williams, at all relevant times, was a detective in the Pueblo County Sheriff's Office acting under color of law and within the scope of his employment for Pueblo County. On information and belief, Defendant Williams resides in Colorado. Defendant Williams is sued in his individual capacity.

21.    Collectively, Defendants Pannunzio, Leach, Bacor, Franklin, Kochevar, Purkett, Thurston, Mora, and Williams are referred to as the "PCSO Defendants."

22.    Defendant Pueblo County Board of Commissioners is the body that oversees the Pueblo County Sheriff's Office. At all relevant times, the Board employed the individual PCSO Defendants and was responsible for the policies, practices, patterns, and customs of the Pueblo County Sheriff's Office.

23.    Defendant Pueblo County is a political subdivision of the State of Colorado and a municipal corporation. At all relevant times, Pueblo County employed the individual PCSO Defendants and was responsible for the policies, practices, patterns, and customs of the Pueblo County Sheriff's Office.

24.     Defendant Pueblo County Sheriff's Office (PCSO) is the agency that is responsible for policing Pueblo County. At all relevant times, the Pueblo County Sheriff's Office employed the individual PCSO Defendants and was responsible for its own policies, practices, patterns, and customs.

25.     Defendant Bradley Pratt, at all relevant times, was a detective in the Colorado Springs Police Department acting under color of law and within the scope of his employment for the City of Colorado Springs. On information and belief, Defendant Pratt resides in Colorado. Defendant Pratt is sued in his individual capacity.

26.     Defendant City of Colorado Springs is a political subdivision of the State of Colorado and a municipal corporation.

27.     At all relevant times, the City of Colorado Springs employed Defendant Bradley Pratt and was responsible for the policies, practices, patterns, and customs of the Colorado Springs Police Department.

## ALLEGATIONS

### Robert Piserchio's Murder

28.      In the late-night hours of December 9, 2010, into the early morning of December 10, 2009, Aaron Wilkerson entered Robert Piserchio's home, killed him, and set his body on fire.

29.     Approximately two weeks before the murder, Karen DePierre and two other women burglarized Piserchio's home. During the burglary, one of the women stole Piserchio's wallet.

30.     DePierre later told Wilkerson what she had learned about Piserchio and gave him Piserchio's address.

31.    On the night of the murder, DePierre saw Wilkerson on two separate occasions at a motel. Before the first encounter, Wilkerson had asked her if she thought Piserchio would have money lying around and told her he was going to Piserchio's home but first had to pick up a taser. Wilkerson then came to the motel alone, showed her a new high-voltage taser, asked if she thought Piserchio would be home, and left.

32.    Later that night, Wilkerson texted DePierre that things had gone bad and he thought Piserchio was dead. In a phone call made from Piserchio's home, Wilkerson frantically told DePierre that he had gotten into a fight with Piserchio and tased him, that Piserchio had gone into the bedroom and obtained a shotgun, that the two men had struggled and the gun had gone off, that Wilkerson had taken the gun away from Piserchio and then hit Piserchio in the head with it, and that afterward, Piserchio was not moving or breathing.

33.    During the phone call, Wilkerson told DePierre that he was alone. Wilkerson later came to DePierre's motel room and told her that after his fight with Piserchio, Wilkerson had found something like paint thinner, spread it around, and lit it on fire. When DePierre saw Wilkerson at the motel, both before and after the murder, he was alone. And in describing what had occurred at Piserchio's home, Wilkerson was clear that he had been alone, and he never suggested that anyone else had been with him.

34.    In the early morning hours of December 10, 2009, law enforcement and other first responders were called to Piserchio's home.

35.    When the fire department arrived, they extinguished a fire in the bedroom and discovered human remains, which they later identified as Piserchio's. The home appeared to have

been ransacked and showed signs of a struggle. There were bloodstains, and furniture was scattered. There were also holes in the interior walls from shotgun blasts.

36.    Piserchio was the brother-in-law of the previous and longtime Pueblo Sheriff, Dan Corsentino, who was present at the Pueblo County Sheriff's Office command post on the morning of December 10.

**Despite Plaintiff's Innocence, Defendants Target Her as a Prime Suspect**

37.    Plaintiff had absolutely nothing to do with Piserchio's murder.

38.    After the robbery and murder, Wilkerson gave stolen business checks from Piserchio to Plaintiff for her to pass.

39.    Wilkerson did not tell Plaintiff that the business checks he had obtained had anything to do with a murder or a robbery.

40.    On December 14, 2009, Plaintiff tried to cash one of Piserchio's business checks at a Wells Fargo branch located inside a Safeway in Colorado Springs. Plaintiff did not know the check was connected to a robbery and murder in Pueblo. She did not complete the transaction and left her identification behind. On December 15, 2009, she was arrested on an unrelated outstanding warrant.

41.    That same day and then again on December 18, 2009, Defendants Captain Don Leach, Sergeant John Pannunzio, and Detective Jeremy Bacor interrogated Plaintiff for approximately seven hours over two sessions. Defendants Leach, Pannunzio, and Bacor were all present at different points of the interrogation. Colorado Springs Police Officer Defendant Bradley Pratt also participated in the December 15 interrogation.

42. During the interrogation, Defendants Leach and Pannunzio threatened Plaintiff that if she did not provide them with information, they would force her to strip naked and then photograph her.

43. Defendants Bacor and Pannunzio interrogated Plaintiff again on January 7, 2010, during which she continued to truthfully deny going to Pueblo the night of the murder or participating in the crime.

44. Throughout the intense interrogation process, Plaintiff truthfully maintained her innocence. She truthfully explained that she did not know Piserchio, had never interacted with him, and had never been to his home. She acknowledged to Defendants Leach, Pannunzio, and Bacor that she had received the checks from Wilkerson.

45. Despite the lack of evidence connecting Plaintiff to Piserchio's murder and Plaintiff's truthful denial of her involvement, Defendants seized on her as a prime suspect in the murder. Defendants maintained their focus on Plaintiff as a primary suspect, even when confronted with evidence to the contrary that undercut their false narrative that she had been involved with the robbery and murder. Throughout their investigation into Piserchio's murder, the PCSO Defendants deliberately failed to investigate evidence that pointed to Wilkerson as the sole murderer and that would have corroborated Plaintiff's innocence.

46. On information and belief, the PCSO Defendants all had access to information and reports about one another's interviews and interrogations of witnesses and suspects throughout the Piserchio murder investigation.

**Certain PCSO Defendants Interview Becky Jo Willson, Who Implicates Wilkerson**

47.    On December 17, 2009, Defendants Pannunzio, Franklin, Kochevar, and Purkett interviewed Becky Jo Willson, who knew Plaintiff and Wilkerson.

48.    Willson was eight months pregnant.

49.    Willson was a regular methamphetamine user who lived with her boyfriend, Brandon Armijo, at an apartment in Colorado Springs belonging to Josh Vyzourek.

50.    Barnes, Plaintiff's former boyfriend, also stayed at this apartment. Willson knew Wilkerson because he was a supplier of methamphetamine.

51.    Willson went voluntarily to the PCSO and spent approximately seven hours there being questioned by Defendants Pannunzio, Franklin, Kochevar, and Purkett.

52.    During her December 17, 2009 interview, Willson truthfully told Defendants Pannunzio, Franklin, Kochevar, and Purkett the following:

    a.    On the evening of December 10, 2009—the evening following the murder—she was at Wilkerson's apartment in Colorado Springs, which he shared with his girlfriend, Cassie Johnston;

    b.    While at Wilkerson's apartment, she overheard a conversation between Johnston and another individual during which Johnston stated that Wilkerson had returned to the apartment that morning between 4:00 and 5:00 a.m. with blood on his shirt and shoes;

    c.    Barnes and Armijo were at Vyzourek's apartment the entire night of December 9–10, 2009;

10

d. Plaintiff went to Vyzourek's apartment around 11:00 p.m. or midnight on the night of December 9–10, and she then left the apartment alone;

e. Plaintiff returned to the apartment at 8:00 a.m. on December 10, 2009, still alone;

f. Barnes did not enter the apartment with or after Plaintiff on December 10, because he had been there all night; and

g. When Willson saw Plaintiff on December 10, 2009, Plaintiff did not have any blood on her.

53.    During this interview, Willson specifically identified Wilkerson as a suspect in Piserchio's murder. Willson even drove to Colorado Springs with Defendants Purkett and Kochevar to point out where Wilkerson lived.

**Certain PCSO Defendants Interview Wilkerson's Girlfriend, Cassie Johnston, Who Provides Additional Evidence Implicating Wilkerson as the Sole Murderer**

54.    Ten days after Piserchio's murder, Defendants Pannunzio and Thurston interrogated Cassie Johnston, Wilkerson's girlfriend.

55.    Johnston told investigators that Wilkerson had returned to their apartment sometime after midnight on the night of the murder, that he was alone, and that he changed clothes and went to bed, where he stayed until the following morning.

56.    Johnston stated that she saw muddy, bloody water on the floor of the bathroom that next morning.

**Wilkerson Is Arrested**

57.    On December 23, 2009, Wilkerson was arrested in Colorado Springs after being spotted driving a car near Fillmore Street east of Interstate 25. Wilkerson crashed into an unmarked police car and was captured after fleeing from the vehicle.

11

**Certain PCSO Defendants Attempt to Coerce and Manipulate
Willson the Second Time They Question Her**

58.     On December 26, 2009, nine days after the initial interview of Willson, Defendants Pannunzio and Thurston interrogated Willson.

59.     The tenor of this interrogation was in stark contrast to the December 17 interview. During this interrogation, Defendants Pannunzio and Thurston threatened Willson, telling her she could be charged with a crime and that she could make a deal to avoid a serious period of incarceration. Defendants Pannunzio and Thurston also threatened Willson with the prospect of being incarcerated and separated from her children.

60.     Despite these threats, Willson stuck to the truth and did not falsely implicate Plaintiff in the Piserchio murder.

**Certain PSCO Defendants Question Willson a Third and Fourth Time, Coercing Her Until
She Falsely Implicates Plaintiff**

61.     Defendants Pannunzio and Bacor questioned Willson for a third and fourth time on January 5 and 6, 2010, while she was in custody and about to give birth.

62.     Defendants Pannunzio's and Bacor's tone was even more aggressive during these interrogations. They brought Willson to tears, told her she could be convicted of a crime, and stated that she could spend years in prison. Unlike the late December interview and interrogation of Willson, the January 5 and 6 interrogations were not recorded.

63.     In addition to these coercive tactics, Defendants Pannunzio and Bacor also used leading questions when interrogating Willson, suggesting the answers they wanted to hear from her.

12

64.    Predictably, under intense psychological pressure from Defendants Pannunzio and Bacor, Willson began to tell them what their questioning made clear they wanted to hear, and she implicated Plaintiff. During the third and fourth interrogations, Willson allegedly (and falsely) told Defendants Pannunzio and Bacor:

    a.    that Plaintiff and Wilkerson went to Pueblo together during the day on December 9;

    b.    that around 10:00 p.m. that night, Plaintiff and Wilkerson together returned to Vyzourek's apartment;

    c.    that Plaintiff, Wilkerson, Armijo, and Barnes left Vyzourek's apartment together around 11:30 p.m. on December 9;

    d.    that Plaintiff and Wilkerson returned to Vyzourek's apartment together the next morning, between 3:30 and 4:00 a.m. on December 10, 2009;

    e.    that a few minutes later, Armijo returned to Vyzourek's apartment; and

    f.    that some 30 to 45 minutes after that, Barnes showed up at Vyzourek's apartment.

65.    The information Defendants Pannunzio and Bacor elicited from Willson under coercive pressure was false and inconsistent with information from her previous interview and interrogations.

66.    It was during these unrecorded, coercive, and deceptive interrogations that Willson began to break down under the intense psychological pressure and falsely implicate Plaintiff, Barnes, and Armijo in the Piserchio murder.

67.    The supposed information Defendants Pannunzio and Bacor obtained from Willson on January 5 and 6 was false and blatantly inconsistent with what Willson had previously told

them, what Johnston had told certain PCSO Defendants, and all the other evidence obtained in the investigation.

68.　Defendants Pannunzio and Bacor also claimed in their police report that during the unrecorded January 5 and 6 interrogations, Willson told them that Plaintiff had some checks in her purse.

69.　Defendants Pannunzio and Bacor also claimed that during the unrecorded January 5 and 6 interrogations, Willson had told them that within hours of the murder, she had seen blood on Plaintiff's jeans that Willson had described as "gooey and gory."

70.　None of these statements were true. Plaintiff did not go to Vyzourek's apartment with Wilkerson at any time on December 10, 2009. And she did not ever have any observable blood on her jeans.

**Karen DePierre Is Arrested and Provides**
**Information Further Implicating Wilkerson as the Sole Murderer**

71.　Within weeks, the supposed information obtained from Willson during the January 5 and 6 interrogations was contradicted by Karen DePierre's statements to officers. On January 29, 2010, DePierre was arrested and interrogated by Defendants Pannunzio, Kochevar, and Thurston at length. After her arrest, DePierre told these Defendants the following information:

　　a.　Approximately two weeks before the murder, she and two other women committed a burglary at Piserchio's house because they heard he had money lying around, and they wanted to see if that was true;

　　b.　She saw the inside of Piserchio's house;

　　c.　Piserchio told her that he had paid cash for the house;

　　d.　She saw that Piserchio had multiple expensive cars at his home;

14

e.  During the burglary, one of the other women stole Piserchio's wallet;

f.  DePierre later told Wilkerson what she had learned about Piserchio and gave him Piserchio's address;

g.  On the night of the murder, she saw Wilkerson on two separate occasions at a motel in Fountain, Colorado, where she was staying;

h.  Before seeing him the first time that night, she had spoken to him about Piserchio, and Wilkerson had asked her if she thought Piserchio would have money lying around. He had told her he was going to Piserchio's home but first needed to pick up a taser;

i.  Wilkerson then came to the motel in Fountain, alone, and showed her a new, high-voltage taser. Wilkerson told her that he had checked out Piserchio's address, and Wilkerson asked her if she thought Piserchio would be home;

j.  Wilkerson then left;

k.  Later that night, Wilkerson texted DePierre that things had gone bad, and he thought Piserchio was dead;

l.  She spoke to Wilkerson on the phone that night, and Wilkerson told her that:

  i.  Piserchio was not breathing;

  ii.  Wilkerson had gotten into a fight with Piserchio and tased Piserchio;

  iii.  Piserchio went into a bedroom and got a shotgun and after the two men struggled, the shotgun went off;

  iv.  Wilkerson then got the gun away from Piserchio, bludgeoned him in the head with it, and Piserchio did not get up.

15

m.  Wilkerson later came to DePierre's motel room during which:

    i.  He told her about the fight with Piserchio; and

    ii.  He told her that after the fight, he found something like paint thinner, which he had spread around and lit on fire;

n.  In describing to DePierre what had occurred at Piserchio's house, Wilkerson was clear that he had been alone and never suggested anyone else had been with him;

o.  When DePierre saw Wilkerson at the motel, both before and after the murder, he was alone.

**Certain PCSO Defendants Arrest and Interrogate Barnes and Obtain a False Confession from Him by Supplying Him with Non-Public Facts About the Crime**

72.  Barnes, who stayed at Vyzourek's apartment with Willson and Armijo and was Plaintiff's former boyfriend, was arrested and interrogated on May 6, 2010, by Defendants Pannunzio, Leroy Mora, and Williams. During the May 6 interrogation, Barnes was high on methamphetamines and severely sleep-deprived.

73.  These Defendants went into the interrogation with Barnes intent on eliciting information that would support the narrative they had determined to assert, regardless of the fact that it was obviously false.

74.  In so doing, they blatantly and knowingly disregarded inconsistent information provided by DePierre, Willson, and Johnston that pointed to Wilkerson as Piserchio's sole killer and indicated that Plaintiff was innocent.

75.  From early in Barnes's May 6 interrogation, these Defendants aggressively questioned Barnes, falsely telling him that there was evidence placing him at the scene of the crime and that other individuals had identified him as one of multiple people responsible for the murder.

16

76.    For instance, these Defendants repeatedly told Barnes that his shoeprint had been found at the murder scene. This was not true. These Defendants also told Barnes that Plaintiff, Armijo, and Wilkerson had each implicated him in the murder. This, too, was untrue.

77.    Yet, despite the persistent and unrelenting interrogation by these Defendants, Barnes maintained for hours that he had not participated in the robbery and murder of Piserchio.

78.    During the interrogation, these Defendants repeatedly supplied Barnes with non-public information that only someone present at the murder scene would know, and repeatedly asked Barnes leading questions which included those non-public facts.

79.    Yet still, Barnes continued to truthfully maintain his innocence and lack of knowledge about the murder or its perpetrator.

80.    At about 2:01 p.m. on May 6, the device that these Defendants were using to record the interrogation stopped recording for more than 30 minutes. The coercive interrogation, however, continued unabated.

81.    More than 30 minutes later, the device resumed recording, conveniently at a time when Barnes was falsely confessing to the murder and falsely implicating Plaintiff and Armijo as participants as well. Yet the moment during the interrogation when Barnes switched from steadfastly maintaining his innocence to falsely confessing to the murder was not recorded. In their reports, these Defendants did not document that the device had stopped recording during Barnes's interrogation.

82.    Barnes's false confession was obviously and provably untrue. Worn down by the lengthy and coercive interrogation, Barnes eventually adopted the false narrative of these Defendants and tried to provide details to support that false version of events. But Barnes had no

idea what had happened, since he had not participated in the robbery or murder. So, Barnes repeatedly "confessed" to details about the murder that these Defendants knew to be false and formed his story of what had occurred at Piserchio's home based on information these Defendants provided to him or information Barnes made up using the provided information as a starting point.

83.    This false confession followed eight hours of coercive interrogation by these Defendants, which caused Barnes's will to be overborne.

84.    Rather than question Barnes's obvious inability to report any details of the crime that had not already been provided to him by these Defendants, these Defendants doubled down on their misconduct, showing Barnes (or telling him about) multiple pieces of evidence—like photographs—and then instructing him to change his statements so that they would match the evidence.

85.    For instance, these Defendants repeatedly showed Barnes photographs of the crime scene to get him to modify his account to match the physical evidence. When Barnes claimed that an attack had occurred in one part of the house, for example, these Defendants showed him crime-scene photographs and asked leading questions to direct him to change his story so that it would match the physical evidence.

86.    As another example, when Barnes said he did not think anything had been used to bind the victim's hands or feet, Defendant Pannunzio supplied him with the answer they wanted, instructing him to "[t]hink real hard. Duct tape."

87.    At another point, Barnes suggested that trash bags had been brought to remove items stolen from the house. But Defendant Pannunzio knew that no trash bags had been found at the scene and that no witness had reported any items taken from the home being in trash bags, so

Defendant Pannunzio quickly told Barnes that the participants did not put items in the bags. Unsurprisingly, Barnes acceded to this instruction and subsequently disclaimed his incorrect statement about trash bags.

88.    At yet another point, Barnes was asked about the victim's head injury. Because he did not know what had caused it, Barnes guessed that a golf club caused the head injury because, as he told Defendant Pannunzio, "you said something about a golf club." Barnes then pivoted and guessed that the injury could have been inflicted by a baseball bat.

89.    But Defendant Pannunzio was not satisfied with that answer and immediately redirected Barnes to a broken plant pot. Defendant Pannunzio had previously suggested to Barnes that someone either threw this pot at Piserchio or Piserchio fell into it. Defendant Pannunzio showed Barnes a crime-scene photo and said, "What I'm asking you is if you remember his head injury, how he got it. You said you didn't know if somebody threw this pot at him or he fell into it." Barnes only said he did not know if someone had thrown a pot at Piserchio or if Piserchio had fallen into a pot because Defendant Pannunzio had suggested to him that such things occurred.

90.    Supplied with Defendant Pannunzio's suggestion of something that had not actually occurred, Barnes then parroted that a planter could have caused a head injury that would make Piserchio bleed enough to leave the blood shown in the photo. Later, Defendant Pannunzio again brought up that the planter might have been thrown at Piserchio. Unsurprisingly, Barnes then said that the planter had been used to knock Piserchio out. After receiving the answer these Defendants wanted to hear from Barnes, Defendant Pannunzio demonstrated his satisfaction with that, mirroring it back to him, saying: "The planter was used to knock him out."

91.     When Defendant Pannunzio told Barnes that Piserchio's body had been burned and that an accelerant had been used, he provided Barnes with detailed information about the specific type of accelerant used:

DEFENDANT PANNUNZIO:        Do you know what they burned him with?

MATTHEW BARNES:             No, ***I've not been told that information yet.***

DEFENDANT PANNUNZIO:        Put some Thompson's Water Seal on him.

(Emphasis added.)

92.     Defendant Pannunzio also supplied Barnes with details about what had been taken from the home, which Barnes then repeated back. For instance, Defendant Pannunzio told him that sports memorabilia had been taken. Detective Pannunzio then prompted Barnes about which specific memorabilia had been taken, asking him, "Chicago Bears jog your memory?"

93.     These Defendants also supplied Barnes with false information that Plaintiff had blood on her. During the first recorded portion of the interrogation, Barnes was adamant that he had never seen blood on Plaintiff. During the second portion of the interrogation, when Defendant Pannunzio asked Barnes about the location of the blood on Plaintiff, Barnes's response demonstrated that these Defendants had provided the information to him during the unrecorded portion of the interrogation:

DEFENDANT PANNUNZIO: Where was the blood on her?

MATTHEW BARNES: All over her, ***like you said***, just basically her t-shirt and her pants. Her knee.

DEFENDANT PANNUNZIO: Knee and her pants.

MATTHEW BARNES: Her shoes.

(Emphasis added.)

94.    Throughout the interrogation, Barnes repeatedly guessed at information and looked to these Defendants to validate his response or correct him.

95.    These Defendants also exacerbated the risk of Barnes's false confession—and thus Plaintiff's wrongful conviction—by falsely telling Barnes there was evidence linking him to the crime and by falsely telling him that his co-defendants, including Plaintiff, had pointed the finger at him. They used express and implied promises to induce Barnes to confess, including by suggesting he would receive leniency if he cooperated instead of having to face first-degree murder charges.

96.    Altogether, Barnes's supposed "confession" to Piserchio's murder included only information that was either obviously false or supplied to him by Defendants. And each time Barnes provided information that Defendants knew to be untrue, they simply instructed him to correct it without ever questioning him as to why he had provided it.

97.    Barnes's interrogation was fertile ground for a false confession. In particular, Barnes was high on methamphetamine, severely sleep-deprived, and interrogated for approximately eight hours.

98.    The majority of proven false confessions involve interrogations lasting six hours or longer.

99.    These Defendants also employed interrogation techniques that have been linked on many occasions to demonstrably false confessions. These included techniques condemned by the leading training programs for law-enforcement interrogators.

21

**Unbeknownst to Plaintiff at the Time, Barnes Informs His Own Lawyer That His Confession Implicating Plaintiff in the Murder Was False**

100.    On August 11, 2010, Barnes wrote his lawyer a letter explaining that his confession had been false, writing:

> I have to confess to you, just so you know cause one of my codefendants will say this at some point in time soon. I lied to the cops in that interview on the 6th of May. I was never there with Aaron [Wilkerson] or Acacia [Lyn-Darr]. … Making up my role in the crime was so easy. Hell the cops helped me the [w]hole way with the pictures. I just thought this info will help out, cause every one involved will know I'm lying through my teeth.

101.    Ten days later, when he was trying to obtain a plea deal for an outcome that would be better than a 30-year prison term, Barnes wrote a follow-up letter telling his lawyer to disregard his previous letter. Having falsely confessed to having participated in the robbery and murder, Barnes was facing charges of first-degree murder after deliberation and first-degree felony murder, which carried a mandatory sentence of life in prison without the possibility of parole.

102.    Barnes's recantation to his lawyer and his later decision to stick with his false confession so he could obtain a plea deal were never known to Plaintiff or her counsel until long after her conviction.

**Plaintiff's Criminal Trial**

103.    Barnes's testimony—based on his coerced, false confession—was the only evidence that directly placed Plaintiff at the scene of the crime.

104.    Barnes testified at Plaintiff's trial consistent with his false confession in order to preserve his plea deal.

105.    When he said he could not recall something, prosecutors either "refreshed his memory" with a portion of the "confession" or presented testimony from one of the PCSO Defendants to impeach him.

106.    Among the false testimony Barnes provided at Plaintiff's trial was the following:

a.    Along with Wilkerson, Plaintiff, and Armijo, Barnes was part of a plot to conduct a fake drug deal in Pueblo, which would really be a robbery for $5,000;

b.    After arriving at Piserchio's home, Wilkerson and Plaintiff beat Piserchio, and Barnes eventually joined in, smashing a planter over Piserchio's head;

c.    A pair of walkie-talkies that had been recovered had been brought to Piserchio's house and used by the participants; and

d.    After Piserchio was bound and dragged to the back of the house, Plaintiff suggested setting him on fire and in fact started the fire.

107.    Willson's trial testimony was also a significant factor in obtaining Plaintiff's conviction.

108.    Due to her prolonged methamphetamine abuse, Willson's memory was extremely poor, and she testified at Plaintiff's trial she had no memory of the night of the murder. Most of Willson's trial testimony consisted of her being impeached with prior statements, primarily from the unrecorded and coerced January 5 and 6 interrogations.

109.    On February 7, 2012, the jury convicted Plaintiff of all counts as charged—first-degree felony murder, first-degree burglary, aggravated robbery, first degree arson, conspiracy to commit burglary, conspiracy to commit robbery—except for first-degree murder after deliberation, for which Plaintiff was convicted of the lesser-included offense of second-degree murder.

110.    On May 7, 2012, Plaintiff was sentenced to a mandatory sentence of life without the possibility of parole.

111.    Because of Defendants' misconduct and the false evidence described above, Plaintiff was charged, prosecuted, convicted, and imprisoned for a murder she did not commit.

**Following His "Critical" Trial Testimony, Barnes's Sentence Is Reduced**

112.    Barnes entered a plea bargain with the prosecution, in which he pled guilty to second-degree murder in exchange for a 30-year sentence and the opportunity to seek a sentence reduction.

113.    A few months after Plaintiff's conviction, and consistent with his plea bargain, Barnes sought a sentence reduction and received a reduced sentence of 28 years.

114.    At the hearing on Barnes's request for a reduction of his sentence, both the trial judge and the lead prosecutor in Plaintiff's trial characterized Barnes's testimony as "critical" in obtaining Plaintiff's conviction.

**Plaintiff's Post-Conviction Proceedings**

Barnes Admits His "Confession" and Testimony Against Plaintiff Were False

115.    In 2019, Barnes admitted to Plaintiff's post-conviction counsel that his statements and testimony about Plaintiff's involvement in the murder were categorically false. He admitted he had not been involved in the robbery and murder and that he was not even in Pueblo when those crimes occurred.

116.    In October 2024, Barnes wrote a letter that was filed in both Plaintiff's and Barnes's post-conviction proceedings, reporting that his supposed "confession" and testimony at Plaintiff's

trial (and Wilkerson's trial)[2] had been false, writing: "My confession was false, I testified twice w[h]ich I should have never done, which was false."

117.    In December 2024, Barnes testified under oath at Plaintiff's post-conviction hearing that his purported confession and trial testimony were both false. In particular, Barnes testified:

    a.    When he was being interrogated, he was high on methamphetamine and had not slept in weeks;

    b.    During the interrogation, he maintained his innocence for hours, but Defendants wore him down, and through their presentation of false evidence, he believed the authorities would successfully pin the crimes on him, no matter what the truth was;

    c.    Defendants falsely told Barnes that his co-defendants—Plaintiff, Armijo, and Wilkerson—had implicated him, causing him to resent them;

    d.    He formed his story of what he claimed had occurred at Piserchio's home based on information provided to him by certain PCSO Defendants, including photographs they showed him; and

    e.    His August 11, 2010 letter to his lawyer was true.

<u>Armijo's Innocence Also Contradicts Barnes's False Confession</u>

118.    On September 24, 2019, Armijo told Plaintiff's post-conviction counsel that he was not involved in Piserchio's murder, and that he was not in Pueblo when it occurred.

---

[2] At Wilkerson's trial, Barnes essentially repeated the testimony that he had previously given during Plaintiff's trial.

119.    Armijo had also been charged with first-degree murder for Piserchio's death. Shortly before his trial, Armijo agreed to plead guilty to one count of aggravated robbery with a stipulated sentence of 24 years to run concurrently with a 22-year sentence that had been imposed in a separate and unrelated case. He stated that he pleaded guilty because he was afraid that if he did not, he would receive a life sentence (like Plaintiff did).

120.    Later, at Plaintiff's post-conviction hearing, Armijo testified to the following:

a.    He did not participate in Piserchio's murder or any of the events that preceded it, he had never been to Piserchio's home, and he is innocent; and

b.    He had never been to Pueblo until after the date of Piserchio's murder.

Willson Affirms the Truth of Her Initial Statements to Defendants, Which Exculpated Plaintiff

121.    At Plaintiff's post-conviction hearing, Willson testified that she recalled being interviewed by the police.

122.    Willson reaffirmed that her initial statements to police were truthful, that Defendants' interrogation of her had become increasingly intense, and that Defendants had provided the answers they wanted Willson to give.

123.    During Plaintiff's post-conviction hearing, Willson categorically denied that she would ever have described blood as "gooey and gory." Indeed, she laughed at the suggestion that she had used those words.

Wilkerson, the Sole Murderer, Admits That Plaintiff Was Not Involved

124.    On March 1, 2022, Wilkerson was interviewed at the Colorado State Penitentiary by Plaintiff's post-conviction counsel. Wilkerson's own lawyer was present as well.

125.    During that interview, Wilkerson admitted:

a. He was present at Piserchio's home on the night Piserchio died;

b. No one went with him to Piserchio's home;

c. Plaintiff was not present at Piserchio's home;

d. Neither Armijo nor Barnes was present at Piserchio's home; and

e. There was a struggle at Piserchio's home.

126.    Wilkerson also provided the following details exculpating Plaintiff, including details that contradicted the content of Barnes's false confession:

a. Wilkerson never would have involved Plaintiff in his business, including making her aware of anything criminal he was involved in;

b. Wilkerson never would have told Plaintiff of his plans to go to Piserchio's house;

c. Plaintiff became involved in this matter only because of the checks Wilkerson gave her;

d. Wilkerson gave her the checks one to two days after Piserchio's death and did so because he believed that either she or people she was acquainted with would know how to use the checks to get money;

e. Wilkerson did not tell her the origin of the checks, including that they were connected with a burglary, robbery, or murder;

f. Plaintiff is innocent of any involvement in the robbery and murder of Piserchio;

g. The planter did not get broken over Piserchio's head; and

h. Wilkerson had never owned, possessed, or used hand-held walkie-talkies, and there would have been no reason to use walkie-talkies during the offense.

**Plaintiff's Convictions Are Vacated, and Shortly After,
the Charges Against Her Are Dismissed**

127. On February 11, 2025, Plaintiff's convictions were vacated.

128. The post-conviction court determined that Plaintiff had met the standard for a new trial based on newly discovered evidence under Colorado Rule of Criminal Procedure 35(c)(2)(V).

129. The court analyzed the following newly discovered evidence:

    a. Barnes's letter to his lawyer saying his confession was false and that any related testimony would also be false;

    b. Barnes's letter to the post-conviction court stating that his testimony against Plaintiff had been false;

    c. Barnes's testimony in December 2024 affirming under oath that his testimony implicating Plaintiff at her trial had been false;

    d. Wilkerson's statements that Plaintiff was not present for or involved in the robbery and murder of Piserchio; and

    e. Armijo's testimony that he was not present for or involved in the robbery and murder of Piserchio.

130. The court found that this newly discovered evidence was material and that if it were presented at a new criminal trial, Plaintiff would probably be acquitted.

131. In determining that the newly discovered evidence merited a new criminal trial, the post-conviction court closely scrutinized Barnes's "confession." The court relied on expert testimony about coercive interrogation techniques that can lead to false confessions and the many instances when certain PCSO Defendants used such techniques during the interrogation of Barnes.

The court noted that those coercive interrogation techniques were consistent with Barnes's own explanations for why he falsely confessed.

132. Particularly notable was the amount of "contamination"—specifically, Defendants providing Barnes with information—which, the court noted, the expert described as "pretty extensive" in the Barnes interrogation.

133. The court concluded that everything about the crime that Barnes described in his confession was either provided to him by Defendants, is uncorroborated by any other evidence, or is actually contradicted by other evidence. The court noted that even the prosecution ultimately agreed that Barnes received information from Defendants and then expanded on it with demonstrably false details.

134. When it came to the importance of Willson's testimony and purported statements to Defendants, the court determined that the information Defendants obtained in the January 2010 Willson interviews ended up forming the basis for the questions asked of and information provided to Barnes.

135. Ultimately, the post-conviction court concluded:

> In sum, a jury hearing the new evidence would be left with no physical or scientific evidence tying Ms. Lyndarr to the scene, and the only witness who has placed her at the scene now swears that was false. The jury would have expert testimony to explain why Mr. Barnes may have made such statements, and the jury would have the statements of Ms. Willson and Mr. Armijo that they were all at Mr. Vyzourek's the entire night. On top of that, the jury would have the statements of the one person known to have been involved, who says he was alone and neither Ms. Lyndarr, Mr. Barnes, nor Mr. Armijo was present or had anything to do with it. The jury would also have the testimony of Ms. DePierre that Mr. Wilkerson acted alone. The jury would be left with evidence that four days after the homicide,

29

Ms. Lyndarr attempted to cash a check taken from Mr. Piserchio's residence. But the jury would have no reliable evidence tying Ms. Lyndarr to the burglary/homicide itself.

136. On May 20, 2025, the State moved to dismiss the case against Plaintiff, stating there was insufficient evidence to establish the elements of her offense.

137. That same day, the post-conviction court granted the prosecution's motion.

**Plaintiff's Damages**

138. The effects of Plaintiff's wrongful incarceration on her life were profound. While Defendants went on about their lives, Plaintiff's life was effectively frozen.

139. Plaintiff knew she was innocent of the crime of which she had been accused and convicted. She was forced to endure the extraordinary emotional trauma of knowing that despite her innocence, she had been ordered to live the rest of her life in prison. Indeed, Plaintiff arrived at prison understanding that she had been ordered to remain behind bars until she died.

140. In addition, although Plaintiff knew she was innocent, she was forced to endure the stress and stigma of being labeled a murderer, as others she interacted with disbelieved her claim of innocence.

141. Even the incarceration she was forced to endure was particularly unjust.

142. During her more than eleven years of wrongful incarceration, Plaintiff was subjected to harsh and dangerous prison conditions, particularly as a transgender woman who was housed in men's prisons.

143. As a result of her sentence of life imprisonment without parole, Plaintiff was denied access to necessary treatment and prison rehabilitation programs that would have been beneficial for her.

144.    It is difficult to describe the sum total of the physical and emotional injuries Plaintiff suffered as a direct result of Defendants' illegal conduct. They include, among other things, Plaintiff's physical injuries; pain and suffering; severe mental anguish; emotional distress; loss of family relationships; severe psychological damage; loss of educational opportunity; loss of professional opportunity; loss of income; inadequate medical care; humiliation, indignities, and embarrassment; degradation; permanent loss of natural psychological development; and restriction on all forms of personal freedom, including but not limited to diet, sleep, personal contact, family relations, educational opportunity, vocational opportunity, athletic opportunity, personal fulfillment, sexual activity, reading, television, movies, travel, enjoyment, and expression, for which she is entitled monetary relief.

### The County and City Defendants' Constitutional Violations

145.    Defendant Pueblo County Board of Commissioners, Defendant Pueblo County, and Defendant Pueblo County Sheriff's Office (collectively the "Pueblo County Defendants") and Defendant City of Colorado Springs are responsible for engaging in and maintaining unconstitutional policies and practices.

146.    Plaintiff's wrongful conviction stemmed from the Pueblo County Defendants' and Defendant City of Colorado Springs's failures to adequately train and discipline Pueblo County Sheriff's Office and Colorado Springs Police Department ("CSPD") employees in multiple areas, including:

    a.  Conducting interrogations and interviews of suspects and witnesses without engaging in psychological abuse, as well as manipulative and coercive conduct;

    b.  Recording the complete interrogations and interviews of suspects and witnesses;

31

   c. Refraining from issuing threats during interrogations, including threats to strip search an individual of the opposite sex;

   d. Refraining from interrogating suspects and witnesses who are apparently in vulnerable or altered states, including under the influence of drugs;

   e. Avoiding fixating on a particular suspect(s) during the investigation, known as "tunnel vision," and in so doing, excluding consideration of contradictory evidence;

   f. Documenting and disclosing all material, exculpatory, and impeachment evidence to defense counsel and the court;

   g. Avoiding inducing false confessions, including asking open-ended questions, and avoiding non-public facts during interrogations.

147. The need to train police officers on the practices above was obvious, given the many well-known and publicized incidents of false confessions by this time. Indeed, Defendant Pannunzio testified in Wilkerson's trial that he never received any formal training about how to properly conduct interrogations.

148. The Pueblo County Defendants and Defendant City of Colorado Springs knew that their officers would confront interrogations and investigations that presented the risks described above in the course of their law-enforcement duties. By failing to train officers on the above practices, the Pueblo County Defendants and Defendant City of Colorado Springs violated Plaintiff's rights by maintaining policies and practices that were the moving force driving the foregoing constitutional violations.

149. The Pueblo County Defendants' and Defendant City of Colorado Springs's policies, customs, and practices were a moving force behind the violation of Plaintiff's rights.

150.    As a direct and proximate result of the Pueblo County Defendants' and Defendant City of Colorado Springs's actions, Plaintiff was wrongfully prosecuted, detained, and incarcerated for over eleven years and suffered the other grievous injuries and damages set forth above.

**Colorado Governmental Immunity Act**

151.    Plaintiff has fully complied with the provisions of Colo. Rev. Stat. section 24–10–109.

**CLAIMS FOR RELIEF**

**FIRST CLAIM FOR RELIEF**

**42 U.S.C. § 1983 – Violation of Due Process and a Fair Trial**
**(Violation of Sixth and Fourteenth Amendments)**
**(Against All Individual Defendants)**

152.    Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

153.    The individual Defendants, acting individually, jointly, and in conspiracy with one another (and individuals yet unknown), and under color of law and within the scope of their employment, deprived Plaintiff of her constitutional rights to due process and to a fair trial.

154.    The individual Defendants accomplished this misconduct in the manner described above, including by unlawfully fabricating evidence that implicated Plaintiff as a perpetrator in the murder of Robert Piserchio, concealing their misconduct, and deliberately withholding exculpatory and impeachment evidence from Plaintiff, her counsel, and prosecutors.

33

155. The individual Defendants intimidated, threatened, and coerced witnesses into inculpating Plaintiff and knowingly fabricated witness statements implicating Plaintiff in Piserchio's murder.

156. Plaintiff is innocent of the murder of Robert Piserchio. Yet as a direct result of Defendants' misconduct, Plaintiff was unlawfully arrested, detained, prosecuted, convicted, and incarcerated for more than eleven years.

157. The individual Defendants' misconduct was objectively unreasonable and was undertaken intentionally with willful indifference to Plaintiff's constitutional rights.

158. The individual Defendants' misconduct was motivated by evil motive or intent and involved reckless or callous indifference to Plaintiff's federally protected rights.

159. As a direct and proximate result of the individual Defendants' actions, Plaintiff was wrongly arrested, prosecuted, detained, and incarcerated for over eleven years and suffered the other grievous injuries and damages set forth above.

160. The individual Defendants' misconduct described in this claim was undertaken pursuant to the policies and practices of the Pueblo County Board of Commissioners, Pueblo County, the Pueblo County Sheriff's Office, and the City of Colorado Springs. These policies and practices proximately caused Plaintiff's injuries, as set forth above.

## SECOND CLAIM FOR RELIEF

**42 U.S.C. § 1983 – Unlawful Seizure and Detention Without Probable Cause**
**(Violation of Fourth and Fourteenth Amendments)**
**(Against All Individual Defendants)**

161. Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

162.    The individual Defendants, despite knowing they lacked probable cause to initially detain and prosecute Plaintiff for the murder of Robert Piserchio and continually detained and prosecuted Plaintiff, thereafter acted individually, jointly, and in conspiracy with one another (and individuals yet unknown), to  cause Plaintiff to be unlawfully detained and prosecuted for that crime in the manner described above. This conduct was undertaken under color of law and within the scope of their authority.

163.    The individual Defendants' conduct violated Plaintiff's rights under the Fourth and Fourteenth Amendments to the United States Constitution.

164.    The individual Defendants' misconduct was objectively unreasonable and was undertaken intentionally with willful indifference to Plaintiff's constitutional rights.

165.    The individual Defendants' misconduct was motivated by evil motive or intent and involved reckless or callous indifference to Plaintiff's federally protected rights.

166.    As a direct and proximate result of the individual Defendants' actions, Plaintiff was wrongly prosecuted, detained, and incarcerated for over eleven years and suffered the other grievous injuries and damages set forth above.

167.    The individual Defendants' misconduct described in this claim was undertaken pursuant to the policies and practices of the Pueblo County Board of Commissioners, Pueblo County, the Pueblo County Sheriff's Office, and the City of Colorado Springs. These policies and practices proximately caused Plaintiff's injuries, as set forth above.

**THIRD CLAIM FOR RELIEF**

**42 U.S.C. § 1983 – Malicious Prosecution**
**(Violation of Fourth and Fourteenth Amendments)**
**(Against All Individual Defendants)**

168.    Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

169.    By engaging in the misconduct described above, the individual Defendants acted individually, jointly, and in conspiracy with one another, to directly cause the criminal prosecution against Plaintiff for the murder of Robert Piserchio to be initiated and continued. The individual Defendants' conduct was undertaken under color of law and within the scope of their authority.

170.    The criminal proceedings against Plaintiff were initiated and continued without any probable cause, which the individual Defendants knew via their misconduct described above.

171.    In causing the criminal proceedings to be commenced and continued without probable cause, the individual Defendants acted maliciously.

172.    Plaintiff is innocent of the murder of Robert Piserchio. Yet as a direct result of the individual Defendants' misconduct, Plaintiff was unlawfully arrested, detained, prosecuted, convicted, and incarcerated for over eleven years.

173.    In 2025, the criminal proceeding against Plaintiff was finally and appropriately terminated in her favor.

174.    The individual Defendants' conduct violated Plaintiff's rights under the Fourth and Fourteenth Amendments to the United States Constitution.

175.    The individual Defendants' misconduct was objectively unreasonable and was undertaken intentionally with willful indifference to Plaintiff's constitutional rights.

36

176. The individual Defendants' misconduct was motivated by evil motive or intent and involved reckless or callous indifference to Plaintiff's federally protected rights.

177. As a direct and proximate result of the individual Defendants' actions, Plaintiff was wrongly prosecuted, detained, and incarcerated for over eleven years and suffered the other grievous injuries and damages set forth above.

178. The individual Defendants' misconduct described in this claim was undertaken pursuant to the policies and practices of the Pueblo County Board of Commissioners, Pueblo County, the Pueblo County Sheriff's Office, and the City of Colorado Springs. These policies and practices proximately caused Plaintiff's injuries, as set forth above.

## FOURTH CLAIM FOR RELEF

### 42 U.S.C. § 1983 – Failure to Intervene
### (Violation of Fourth and Fourteenth Amendments)
### (Against All Individual Defendants)

179. Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

180. By their conduct and under color of law, during the constitutional violations described in this Complaint, the individual Defendants stood by without intervening to prevent the violation of Plaintiff's constitutional rights, even though the individual Defendants knew these violations were ongoing and had one or more reasonable opportunities to intervene.

181. This misconduct was objectively unreasonable and was undertaken intentionally, with willful indifference to Plaintiff's rights.

182. The individual Defendants' misconduct was motivated by evil motive or intent and involved reckless or callous indifference to Plaintiff's federally protected rights.

37

183.    As a direct and proximate result of the individual Defendants' actions, Plaintiff was wrongly prosecuted, detained, and incarcerated for over eleven years and suffered the other grievous injuries and damages set forth above.

184.    The individual Defendants' misconduct described in this claim was undertaken pursuant to the policies and practices of the Pueblo County Board of Commissioners, Pueblo County, the Pueblo County Sheriff's Office, and the City of Colorado Springs. These policies and practices proximately caused Plaintiff's injuries, as set forth above.

**FIFTH CLAIM FOR RELIEF**

**42 U.S.C. § 1983 – Conspiracy**
**(Violations of Fourth, Sixth, and Fourteenth Amendments)**
**(Against All Individual Defendants)**

185.    Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

186.    The individual Defendants agreed among themselves and other individuals (including those yet unknown) to act in concert to deprive Plaintiff of her constitutional rights, as described above. Defendants reached this agreement before Plaintiff was arrested, and the agreement remained in place throughout her detention, prosecution, conviction, and imprisonment.

187.    The Defendants engaged in several overt acts in furtherance of the conspiracy, including but not limited to:

    a.    Pressuring and threatening Becky Jo Willson to implicate Plaintiff;

    b.    Pressuring, threatening, and coaching Matthew Barnes to implicate Plaintiff;

    c.    Failing to report and alert necessary authorities to Plaintiff's innocence.

188.    This misconduct was objectively unreasonable and was undertaken intentionally, with willful indifference to Plaintiff's rights.

189.    The individual Defendants' misconduct was motivated by evil motive or intent and involved reckless or callous indifference to Plaintiff's federally protected rights.

190.    As a direct and proximate result of the Defendants' conspiracy, Plaintiff was wrongly prosecuted, detained, and incarcerated for over eleven years and suffered the other grievous injuries and damages set forth above.

191.    The individual Defendants' misconduct described in this claim was undertaken pursuant to the policies and practices of the Pueblo County Board of Commissioners, Pueblo County, the Pueblo County Sheriff's Office, and the City of Colorado Springs. These policies and practices proximately caused Plaintiff's injuries, as set forth above.

## SIXTH CLAIM FOR RELIEF

### 42 U.S.C. § 1983 – *Monell* Claim
### (Against the Pueblo County Defendants
### and City of Colorado Springs)

192.    Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

193.    The Pueblo County Board of Commissioners, Pueblo County, and the Pueblo County Sheriff's Office (collectively "Pueblo County Defendants") were at all times relevant to this Complaint responsible for the policies, practices, and customs of the Pueblo County Sheriff's Office.

194. The City of Colorado Springs ("City") was at all times relevant to this Complaint responsible for the policies, practices, and customs of the Colorado Springs Police Department ("CSPD").

195. Prior to the events giving rise to Plaintiff's Complaint, the Pueblo County Defendants, through the PCSO, and the City, through the CSPD, had notice of policies, customs, and widespread practices of misconduct and corruption by PCSO and CSPD employees.

196. Despite knowledge of these problematic policies and practices, the Pueblo County Defendants and the City took no meaningful action to modify or stop them, thereby acting with deliberate indifference.

197. These policies and practices included, among other things:

a. Failing to document and disclose material, exculpatory and impeachment evidence to prosecutors, defense counsel, and the court;

b. Failing to investigate known exculpatory evidence;

c. Intimidating, coercing, and coaching witnesses to give untruthful statements;

d. Failing to adhere to the standard of probable cause;

e. Failing to comply with widely accepted standards governing investigations.

198. These widespread policies and practices were allowed to flourish because the Pueblo County Defendants and the City directly encouraged the very type of misconduct at issue in this case, failed to provide adequate training and supervision of PCSO and CSPD employees, and/or failed to adequately punish, discipline, and deter prior instances of misconduct. In this way, the Pueblo County Defendants and the City violated Plaintiff's rights by maintaining policies and practices that were the moving force driving the foregoing constitutional violations.

199.    The Pueblo County Defendants and the City also failed to train their respective employees on the above policies and practices, even though they knew to a moral certainty that their respective employees required training and would have helped their respective employees avoid eliciting false confessions and avoid wrongfully convicting suspects like Plaintiff.

200.    Each of the Pueblo County Defendants' and the City's respective policies, customs, and patterns and practices were a moving force behind the violation of Plaintiff's rights.

201.    As a direct and proximate result of the Pueblo County Defendants' and City's actions, Plaintiff was wrongly prosecuted, detained, and incarcerated for more than eleven years and suffered the other grievous injuries and damages set forth above.

## SEVENTH CLAIM FOR RELIEF

### State Law Claim – Malicious Prosecution
### (Against All Individual Defendants)

202.    Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

203.    Defendants, acting individually, jointly, and in conspiracy with one another (including those yet unknown), caused Plaintiff to be improperly subjected to criminal proceedings for which there was no probable cause.

204.    These criminal proceedings commenced and continued with malice and resulted in injury to Plaintiff. All such proceedings were ultimately terminated in Plaintiff's favor.

205.    Defendants accused Plaintiff of murdering Robert Piserchio despite knowing she was innocent of the crime. Defendants fabricated evidence, manipulated, and intimidated witnesses, and withheld material exculpatory evidence. Defendants knowingly made false

41

statements to prosecutors with the intent of exerting influence to commence and continue criminal proceedings against Plaintiff.

206. Defendants engaged in the misconduct described in this claim with malice, willfulness, wantonness, and a reckless indifference to Plaintiff's rights.

207. As a direct and proximate result of Defendants' actions, Plaintiff was wrongly prosecuted, detained, and incarcerated for more than eleven years and suffered the other grievous injuries and damages set forth above.

## EIGHTH CLAIM FOR RELIEF

### State Law Claim – False Arrest and Imprisonment
### (Against All Individual Defendants)

208. Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

209. Plaintiff was unlawfully detained and arrested without probable cause.

210. The individual Defendants initiated, caused, or participated in Plaintiff's arrest and detention, with the intention to restrict Plaintiff's freedom of movement.

211. Defendants engaged in the misconduct described in this claim with malice, willfulness, wantonness, and a reckless indifference to Plaintiff's rights.

212. As a direct and proximate result of Defendants' actions, Plaintiff was wrongly prosecuted, detained, incarcerated, and her freedom of movement restricted for over eleven years and suffered the other grievous injuries and damages set forth above. During that time, Plaintiff was aware that her freedom of movement was restricted.

42

## NINTH CLAIM FOR RELIEF

### State Law Claim – Intentional Infliction of Emotional Distress
### (Against All Individual Defendants)

213.    Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

214.    The individual Defendants' conduct as described above that resulted in Plaintiff's wrongful arrest and decades of wrongful incarceration was extreme and outrageous. Defendants' actions were rooted in an abuse of power or authority and Defendants acted as they did because they intended to inflict severe emotional distress or knew that severe emotional distress would be certain or substantially certain to result from their conduct.

215.    Defendants engaged in the misconduct described in this claim with malice, willfulness, wantonness, and a reckless indifference to Plaintiff's rights.

216.    As a result of this extreme and outrageous conduct, Plaintiff suffered severe emotional distress, as she was forced to spend over eleven years in prison for a murder she did not commit.

## TENTH CLAIM FOR RELIEF

### State Law Claim – Civil Conspiracy
### (Against All Individual Defendants)

217.    Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

218.    The Defendants agreed among themselves and other individuals (including those yet unknown) to act in concert to frame Plaintiff for a crime she did not commit and conspired by concerted action to accomplish an unlawful purpose, or a lawful purpose by unlawful means. In

addition, the co-conspirators agreed amongst themselves to protect each other from liability for depriving Plaintiff of her rights.

219.    In furtherance of the conspiracy, each co-conspirator committed overt acts and was otherwise a willful participant in joint activity.

220.    The violations of Colorado law described in this Complaint, including Defendants' malicious prosecution and false arrest of Plaintiff and their intentional inflection of emotional distress, were accomplished by Defendants' conspiracy.

221.    Defendants engaged in the misconduct described in this claim with malice, willfulness, wantonness, and a reckless indifference to Plaintiff's rights.

222.    As a direct and proximate result of Defendants' actions, Plaintiff was wrongly prosecuted, detained, and incarcerated for over eleven years and suffered the other grievous injuries and damages set forth above.

## ELEVENTH CLAIM FOR RELIEF

**State Law Claim – Enhance Law Enforcement Integrity Act (Colo. Rev. Stat. § 13-21-131)**
**(Violation of Colo. Const. Art. II, Sections 16, 25)**
**(Against All Individual Defendants)**

223.    Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

224.    The individual Defendants, acting individually, jointly, and in conspiracy with one another (and individuals yet unknown), and under color of law and within the scope of their employment, deprived Plaintiff of her rights to due process and to a fair trial under Article II, Sections 16 and 25 of the Colorado Constitution.

44

225.    The individual Defendants accomplished this misconduct in the manner described above, including by unlawfully fabricating evidence that implicated Plaintiff as a perpetrator in the murder of Robert Piserchio, concealing their misconduct, and deliberately withholding exculpatory and impeachment evidence from Plaintiff, her counsel, and prosecutors.

226.    The individual Defendants intimidated, threatened, and coerced witnesses into inculpating Plaintiff and knowingly fabricated witness statements implicating Plaintiff in Piserchio's murder.

227.    Plaintiff is innocent of the murder of Robert Piserchio. Yet as a direct result of Defendants' misconduct, Plaintiff was unlawfully arrested, detained, prosecuted, convicted, and incarcerated for more than eleven years.

228.    The individual Defendants' misconduct was objectively unreasonable and was undertaken intentionally with willful and reckless indifference to Plaintiff's constitutional rights.

229.    As a direct and proximate result of the individual Defendants' actions, Plaintiff was wrongly arrested, prosecuted, detained, and incarcerated for over eleven years and suffered the other grievous injuries and damages set forth above, in violation of Article II, Sections 16 and 25 of the Colorado Constitution.

## TWELFTH CLAIM FOR RELIEF

**State Law Claim – Enhance Law Enforcement Integrity Act (Colo. Rev. Stat. § 13-21-131)**
**(Violation of Colo. Const. Art. II, Section 7)**
**(Against All Individual Defendants)**

230.    Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

231.    The individual Defendants, despite knowing they lacked probable cause to initially detain and prosecute Plaintiff for the murder of Robert Piserchio and continually detained and prosecuted Plaintiff, thereafter acted individually, jointly, and in conspiracy with one another (and individuals yet unknown), to cause Plaintiff to be unlawfully detained and prosecuted for that crime in the manner described above. This conduct was undertaken under color of law and within the scope of their authority.

232.    The individual Defendants' misconduct was objectively unreasonable and was undertaken intentionally with willful and reckless indifference to Plaintiff's constitutional rights.

233.    As a direct and proximate result of the individual Defendants' actions, Plaintiff was wrongly prosecuted, detained, and incarcerated for over eleven years and suffered the other grievous injuries and damages set forth above, in violation of Article II, Section 7 of the Colorado Constitution.

## THIRTEENTH CLAIM FOR RELIEF

### State Law Claim – Respondeat Superior/Indemnification
### (Against the Pueblo County Defendants
### and City of Colorado Springs)

234.    Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

235.    During all relevant times, the PCSO Defendants were employed by the Pueblo County Defendants, and Defendant Pratt was employed by the City of Colorado Springs.

236.    As described above, while acting in the course and scope of their respective employment, Defendants committed tortious acts against Plaintiff, causing her to suffer the above-described injuries.

237.    The Pueblo County Defendants and Defendant City of Colorado Springs are liable for all torts committed by their respective employees in the course and scope of their employment.

238.    In addition, the Pueblo County Defendants and City of Colorado Springs are liable to Plaintiffs under any applicable contractual or statutory obligation that directs each of them to pay a tort judgment for compensatory damages for which their respective employees are liable arising from acts performed within the scope of their employment.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Acacia Lyn-Darr hereby respectfully requests that this Court enter a judgment in her favor and against each of the Defendants, and grant her all relief that this Court deems just and appropriate, including, but not limited to:

(a) Past and future economic losses on all claims allowed by law, including but not limited to lost earnings and medical related expenses, in an amount to be determined at trial;

(b) Compensatory and consequential damages, including, but not limited to, damages for emotional distress, loss of enjoyment of life, and other pain and suffering on all claims allowed by law in an amount to be determined at trial;

(c) Punitive damages on all claims allowed by law and in an amount to be determined at trial;

(d) Attorneys' fees and the costs associated with this action, including expert witness fees, on all claims allowed by law;

(e) Pre- and post-judgment interest at the lawful rate;

(f) Any other relief allowed by law that this court deems just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury pursuant to Rule 38(b) of the Federal Rules of Civil Procedure on all issues so triable.

Dated: May 19, 2026

Respectfully submitted,

s/ Sarah Grady
**_Sarah Grady_**
David Schmutzer
Annie Prossnitz
KAPLAN & GRADY LLC
2071 N. Southport Ave., Ste. 205
Chicago, IL 60614
Telephone: (312) 852-2184
sarah@kaplangrady.com
david@kaplangrady.com
prossnitz@kaplangrady.com

Gail K. Johnson
Eric K. Klein
JOHNSON & KLEIN, PLLC
5398 Manhattan Circle
Boulder, CO 80303
Telephone: (303) 444-1885
gjohnson@johnsonklein.com
eklein@johnsonklein.com

*Attorneys for Plaintiff Acacia Lyn-Darr*

48