PUEBLO COUNTY
COLORADO

COUNTY ATTORNEY'S OFFICE
Cynthia Mitchell
County Attorney

VIA E-MAIL

County Technical Services, Inc.
Attn: Enid Cordova
800 Grant Street, Suite 400
Denver, CO 80203

**CLAIMANT(S):**Acacia Lyn-Darr (Acacia Lyndarr)
**DOL:** December 2009-2025

Dear Enid Cordova:

Enclosed please find a copy of a letter from Johnson and Klein Law on behalf of their client, Acacia Lyn-Darr. It alleges malicious prosecution, and wrongful conviction of Acacia Lyn-Darr. Ms. Lyn-Darr was a co-defendant in the first-degree homicide case of Robert Piserchio, the then brother-in-law of former Pueblo County Sheriff Dan Corsentino. Ms. Lyn-Dar was found guilty at trial. In February 2025, the district court granted Ms. Lyn-Darr's 35C petition and in May of this year the charges against her were dismissed by the District Attorney.

Please put the County's insurance carrier on notice as soon as possible in order to protect the County's interest in this matter. If this claim is one which would not be covered by the County's insurance, or which the insurance company will not defend, please notify this office as soon as that determination is made.

Also, please keep this office copied with any correspondence between yourself and the applicable insurance company and ask them to keep us copied with any correspondence, or pleadings involved in the pursuit or defense of this claim so that we may properly maintain our files. We also request the insurance company keep this office advised of any settlement negotiations regarding this claim.

Thank you very much for your time and attention in the above matter and please don't hesitate to contact this office should you have any questions or concerns, 719-583-6630.

Sincerely,

Michelle Wiseman
Paralegal I

JOHNSON & KLEIN LAW
CRIMINAL DEFENSE & CIVIL RIGHTS

November 17, 2025

**BY HAND AND EMAIL**

Zach Swearingen
Chairman
Pueblo County Board of Commissioners
Pueblo County Historical Courthouse
215 W. 10 Street
Pueblo, CO 81003

Sheriff David J. Lucero
Pueblo County Sheriff's Office
909 Court Street
Pueblo, CO 81003
civil@pueblocounty.us

Cynthia Mitchell, Esq.
Pueblo County Attorney
Pueblo County Historical Courthouse
215 W. 10 Street, Room 302
Pueblo, CO 81003
co.atty@pueblocounty.us

District Attorney Kala Beauvais
10th Judicial District Attorney's Office
701 Court Street
Pueblo, CO 81003
co.atty@pueblocounty.us

Re: *Acacia Lyn-Darr (a/k/a Acacia Lyndarr)*

All:

This letter serves as a Notice of Claims pursuant to the Colorado Governmental Immunity Act, § 24-10-101, C.R.S., *et seq.*, on behalf of Acacia Lyn-Darr stating claims against Pueblo County, the Pueblo County Sheriff's Office (PCSO), and the 10th Judicial District Attorney's Office arising from the malicious prosecution and wrongful conviction and incarceration of Ms. Lyn-Darr. This letter serves as a Notice of Claim pursuant to § 24-10-109, C.R.S., to provide you notice of claims against various employees of Pueblo County, PCSO, and the 10th Judicial District Attorney's Office in both their individual and official capacities.

# NOTIFICATION PURSUANT TO § 24-10-109, C.R.S.

## IDENTITY OF CLAIMANT

Acacia Lyn-Darr (a/k/a Acacia Lyndarr)
c/o Johnson & Klein, PLLC
5398 Manhattan Circle
Boulder, CO 80303

## CLAIMANT'S ATTORNEYS

Eric K. Klein
Gail K. Johnson
Johnson & Klein, PLLC
5398 Manhattan Circle
Boulder, CO 80303
eklein@johnsonklein.com
gjohnson@johnsonklein.com

## BASIS OF CLAIMS[1]

Ms. Lyn-Darr was wrongfully convicted of a brutal murder and arson that occurred in December 2009. Her conviction was the result of a false confession by a codefendant, Matthew Barnes, which was coerced from Mr. Barnes by PCSO investigators, who fed him information to implicate Ms. Lyn-Darr. PCSO investigators also coerced and fabricated other witness testimony to implicate Ms. Lyn-Darr. When strong evidence of Ms. Lyn-Darr's innocence became known, the 10th Judicial District Attorney's Office engaged in unconstitutional means to keep her imprisoned.

The victim of the homicide was the brother-in-law of the previous Pueblo Sheriff, Dan Corsentino, who had recently left his position. Perhaps out of an abiding loyalty to former Sheriff Corsentino, members of PCSO pursued an overzealous investigation, determined to round up as many people as possible. Thus, PCSO personnel ignored information that one man, Aaron Wilkerson, had acted alone, and instead set their sights on three other, innocent people—Ms. Lyn-Darr, Mr. Barnes, and Brandon Armijo—eventually causing all three to go to prison for crimes they did not commit. In their zeal, PCSO investigators coerced false information from a witness named Becky Jo Willson, and then, using that information to form their theory of the case, PCSO coerced Mr. Barnes to give false information that conformed to what they had allegedly obtained from Ms. Willson. Without the coerced false information, Ms. Lyn-Darr would never have been convicted. No physical or scientific evidence placed Ms. Lyn-Darr at the scene. The only evidence placing her at the scene were the statements and testimony of Mr. Barnes, which were the direct product of his coerced and false confession.

---

[1] The description of events and related claims is based on information currently available to counsel. Additional information is in the possession or control of the governmental agencies and their agents. Counsel may supplement these facts as new information is made available.

At approximately 1:45 a.m. on December 10, 2009, law enforcement and fire personnel were called to the home of Robert Piserchio. They discovered Mr. Piserchio's dead body, which had been set on fire. The home showed signs a struggle had taken place, including bloodstains, disturbed furniture, a broken planter, and various holes in the walls, two of which would later be identified as shotgun blasts.

Four days later, on December 14, 2009, Ms. Lyn-Darr attempted to cash one of several checks she had obtained from Mr. Wilkerson that were associated with Mr. Piserchio's business. She attempted to cash the check at a Wells Fargo bank, located inside a Safeway at 3275 W. Colorado Avenue in Colorado Springs. Ms. Lyn-Darr did not know the check was connected to a homicide in Pueblo. Ms. Lyn-Darr did not complete the transaction and left her identification behind. Police arrested her the next day.

Following her arrest, Ms. Lyn-Darr was questioned by law enforcement at length. Throughout the interrogation, Ms. Lyn-Darr maintained her innocence of the murder and arson. As the Colorado Court of Appeals has already determined, the interrogation became coercive, with male PCSO investigators threatening to force Ms. Lyn-Darr (a transgender woman) to strip naked and be photographed if she did not provide the investigators with information. The first time police questioned Ms. Lyn-Darr, she indicated that she had information about who was involved in the Piserchio homicide—i.e., who she had received the checks from—but she said she was scared of what this person would do if Ms. Lyn-Darr provided information to the police. In a second interview, Ms. Lyn-Darr indicated to police that she had received the checks from Mr. Wilkerson.

After Ms. Lyn-Darr's arrest, police searched the trailer where she had been living in Colorado Springs and her belongings recovered therein. Among other items recovered were pawn slips signed by Mr. Barnes, Ms. Lyn-Darr's then-boyfriend. Investigators would determine that these pawn slips were for items taken from Mr. Piserchio's home. They also discovered a notepad indicating that someone had practiced Mr. Piserchio's signature.

By the beginning of 2010, PCSO investigators had reliable information that Mr. Wilkerson had acted alone in killing Mr. Pieserchio. A key witness was Ms. Willson, a young woman who was close to Ms. Lyn-Darr. Ms. Willson was a regular methamphetamine user who lived with her boyfriend, Mr. Armijo, at an apartment in Colorado Springs belonging to Josh Vyzourek. Mr. Barnes also stayed at this apartment. Ms. Willson knew Mr. Wilkerson because he was a supplier of methamphetamine. PCSO investigators first interviewed Ms. Willson on December 17, 2009. This interview was out-of-custody and voluntary. Ms. Willson went voluntarily to PCSO and spent approximately seven hours with PCSO investigators. As she has now testified under oath, during that interview, Ms. Willson was as truthful, forthright, and honest as she could be, and she gave the investigators as much information as she knew. Ms. Willson told them that on the evening of December 10—the evening following the homicide—she had been at the Colorado Springs apartment of Mr. Wilkerson and his girlfriend, Cassie Johnston. While there, Ms. Willson overheard a conversation between Ms. Johnston and another friend about Mr. Wilkerson having returned that morning between 4:00 and 5:00 a.m. with blood on his shirt and shoes. Ms. Willson told investigators that Mr. Armijo and Mr. Barnes had been

with her at Mr. Vyzourek's apartment the entire night of December 9-10, 2009. Ms. Willson told investigators that Ms. Lyn-Darr had come to the apartment around 11:00 or 12:00 on the night of December 9, and she had left alone. Ms. Willson said Ms. Lyn-Darr came back to Mr. Vyzourek's apartment at 8:00 a.m. on December 10, 2009. Once again, Ms. Lyn-Darr was alone. Ms. Willson was clear that Mr. Barnes did not come in with or after Ms. Lyn-Darr, because Mr. Barnes had been there the whole night. Ms. Willson did not see Mr. Wilkerson until December 11; she specifically corrected a detective who suggested she had seen Mr. Wilkerson on December 10. Ms. Willson also described the clothing Ms. Lyn-Darr had been wearing on December 10 and was clear that Ms. Lyn-Darr did not have any blood on her. During this lengthy, voluntary interview, Ms. Willson became the first person to identify Mr. Wilkerson for the investigators, much to their delight. She even drove to Colorado Springs with the investigators to show them where Mr. Wilkerson lived.

PCSO investigators interviewed Ms. Willson again on December 26, 2009. This, however, was more of an interrogation than an interview. The tenor of the interview was nothing like December 17. Ms. Willson was in custody and pregnant. The PCSO investigators were harsher. They threatened her that she could be charged with a crime, and they told her that she could make a deal to avoid serious time and not have to parent her children from prison. They raised their voices and challenged whether she was telling the truth. Still, Ms. Willson continued telling the truth, and nothing she said inculpated Ms. Lyn-Darr beyond possession of the checks.

But the investigators were not satisfied to have only one person to blame for the death of former Sheriff Corsentino's brother-in-law. So they kept trying to force different information out of witnesses like Ms. Willson. Unsatisfied with the results of the first two interviews, PCSO investigators interviewed her again on January 5 and 6, 2010, while she was in custody and about to give birth. Unlike the prior interviews, these were not recorded. A PCSO investigator claimed that his digital recorder failed to work—both days. The tone of the investigators was even harsher in those interviews than in the one on December 26. PCSO investigators brought Ms. Willson to tears. They strongly suggested she could be convicted of a crime and told her that she could spend years in prison. They used leading questions, suggesting to Ms. Willson what they wanted to hear.

It was during these unrecorded, coercive, and leading interviews that Ms. Willson purportedly first implicated Ms. Lyn-Darr, Mr. Barnes, and Mr. Armijo in the Piserchio homicide. PCSO investigators claimed that in these unrecorded interviews, Ms. Willson had said, *inter alia*, that Ms. Lyn-Darr and Mr. Wilkerson had gone to Pueblo during the day on December 9, 2010. They claimed Ms. Willson had said that around 10:00 that night, Ms. Lyn-Darr and Mr. Wilkerson together returned to Mr. Vyzourek's apartment. They said Ms. Willson had told them in this unrecorded interview that Ms. Lyn-Darr, Mr. Wilkerson, Mr. Armijo, and Mr. Barnes had left together around 11:30 p.m. According to the PCSO investigators, Ms. Willson had said: (i) Ms. Lyn-Darr and Mr. Wilkerson returned together between 3:30 and 4:00 a.m.; (ii) Mr. Armijo returned a few minutes later; and (iii) Mr. Barnes showed up some 30 to 45 minutes after that. This was inconsistent with what Mr. Wilkerson's girlfriend, Cassie Johnston, had told investigators just 10 days after the crime. Ms. Johnston had told PCSO investigators that: (i) Mr. Wilkerson had returned to *their own* apartment sometime after midnight on December 10, 2009; (ii) he was alone; and (iii) he changed clothes and went to bed, where he stayed until the

following morning. But PCSO investigators ignored this information in their interrogation of Ms. Willson because it did not fit with their theory. PCSO investigators also claimed Ms. Willson said that when the four others returned, Mr. Wilkerson was carrying a laptop computer in his hands. But no laptop had been stolen. And, they said, Ms. Lyn-Darr had some checks in her purse. According to the PCSO investigators, Ms. Willson had said this time that she saw blood on Ms. Lyn-Darr's jeans within hours of the homicide. Investigators claimed she had said the blood was not dry and described it as "gooey and gory." Ms. Willson would later under oath flatly deny having said this and laughed at the possibility she would have used such words. The investigators also said Ms. Willson described Mr. Wilkerson confessing to her that night and threatening her and her unborn child if she told anyone.

Long after Ms. Lyn-Darr's trial, the District Attorney eventually recognized the serious problems with these January 2010 interviews of Ms. Willson, stating in a post-conviction filing:

> In Becky Jo Willson's first interview with law enforcement, on Dec 17, 2009, she denied observing blood on defendant's person, and her first two interviews on December 17 and 26 to law enforcement, both of which were recorded, did not implicate defendant in the murder. It was not until her third and fourth interviews with law enforcement on January 5th and 6th, 2011, neither of which were recorded (reportedly due to technical difficulties), that Willson implicated defendant in the murder. Willson was not a participant and was not present during the murder.

People's Proposed Findings of Fact Regarding Newly Discovered Evidence Claim, ¶ 21(a), *People v. Lyndarr*, Case No. 10CR89 (Pueblo Dec. 9, 2024) [hereinafter "People's Prop. Find."].

The information PCSO investigators claimed to have obtained from these interviews became the investigators' working theory of the case and the basis for later interviews and interrogations. This has been confirmed by the Pueblo County District Attorney's Office.

Within weeks, the information coerced out of Ms. Willson in the unrecorded interrogations was contradicted by the one witness with the most knowledge about what happened the night Mr. Piserchio was killed (other than Wilkerson himself)—Karen DePierre. At the end of January 2010, Ms. DePierre was arrested for Mr. Piserchio's murder and spoke to PCSO investigators at length. She explained that approximately two weeks before the murder, she and two other women had gone to Mr. Piserchio's house because they had heard he had money laying around, and they wanted to see if it was true. Ms. DePierre had seen the inside of Mr. Piserchio's house, learned that he paid $250,000 cash for it, and had seen his expensive cars. One of the other women stole Mr. Piserchio's wallet. Ms. DePierre later told Mr. Wilkerson what she had learned about Mr. Piserchio and gave him Mr. Piserchio's address.

Ms. DePierre told PCSO investigators that on the night of the homicide she saw Mr. Wilkerson on two separate occasions at a motel in Fountain where she was staying. Before seeing him the first time that night, she had spoken to him about Mr. Piserchio. Mr. Wilkerson asked if she thought Mr. Piserchio would have money laying around and told her he was going to Mr. Piserchio's home but first had to pick up a taser. He then came to the motel in Fountain.

When Ms. DePierre saw Mr. Wilkerson before the homicide, he was alone. He showed her a new, high-voltage taser he had. He told her he had checked out Mr. Piserchio's address and asked if she thought Mr. Piserchio would be home. Mr. Wilkerson then left. Later that night, Mr. Wilkerson texted Ms. DePierre that things had gone bad, and Mr. Wilkerson thought Mr. Piserchio was dead. She then spoke to Mr. Wilkerson by phone. Mr. Wilkerson was panicked and told her that Mr. Piserchio was dead. He explained that he had gotten into a fight with Mr. Piserchio and he had tased Mr. Piserchio. He told her that Mr. Piserchio had gone into the bedroom and gotten a shotgun. The two men had struggled, and the gun had gone off. Mr. Wilkerson had gotten the gun away from Mr. Piserchio and hit him in the head with it. Mr. Piserchio had fallen down and did not get back up. Mr. Wilkerson later came to Ms. DePierre's motel room. He told her about the fight and told her that after the fight Mr. Wilkerson found something like paint thinner, which he had spread around and lit on fire. In describing what had occurred, Mr. Wilkerson was clear that he had been alone and never suggested that anyone else had been with him. When Ms. DePierre saw Mr. Wilkerson both before and after the homicide, he was alone.

Despite all the reliable information pointing to Mr. Wilkerson having acted alone, PCSO investigators persisted in pursuing their false narrative that Ms. Lyn-Darr, Mr. Barnes, and Mr. Armijo were all also involved. Thus, when Mr. Barnes was arrested in May 2010, investigators went into the interrogation set on eliciting information that would support the narrative they had allegedly gotten from Ms. Willson a few months earlier. The interrogation of Mr. Barnes and the resulting testimony were key to charging Ms. Lyn-Darr with murder and absolutely necessary to obtaining a conviction.

In the face of a persistent and thorough interrogation, Mr. Barnes maintained for hours that he had not participated in the homicide but had only pawned items he received from Wilkerson, which he did not know came from a homicide. Although PSCO investigators accused him of having participated in the homicide and presented him with false evidence, Mr. Barnes nonetheless offered five times to take a polygraph test to prove he had not been present or involved. Ultimately, however, Mr. Barnes falsely confessed to participating in the murder, and he implicated Ms. Lyn-Darr, Mr. Armijo, and Mr. Wilkerson. But Mr. Barnes's confession and the information implicating these people were the result of a coercive interrogation during which PCSO investigators fed him the information that would form the basis of Ms. Lyn-Darr's convictions. In post-conviction proceedings, the District Attorney characterized the interrogation of Mr. Barnes as follows:

> When he was arrested in May of 2010, Barnes eventually confessed to being an eyewitness and participant in the murder after approximately 8 hours of interrogation during which: Law enforcement repeatedly supplied Barnes with information that only someone present at the murder would know, and law enforcement repeatedly asked Barnes leading questions which included that information.

People's Prop. Find., ¶ 10.

During the interrogation, multiple PCSO investigators fabricated evidence against Mr. Barnes. Investigators repeatedly told him his shoeprint had been located at the scene. This was not true. And they told him Ms. Lyn-Darr, Mr. Armijo, and Mr. Wilkerson had implicated him. This, too, was untrue. But thinking they had, Mr. Barnes felt resentment toward them and was eventually willing to falsely implicate them in turn. He was especially willing to falsely implicate Ms. Lyn-Darr because of anger arising from their sexual relationship.

Still, even with PCSO investigators fabricating evidence against him and employing psychological techniques designed to elicit a confession, Mr. Barnes steadfastly maintained his innocence for more than four hours of the recorded interrogation. But according to the PCSO, the recording device then suddenly and inexplicably stopped working. PCSO claimed that over a half hour later the recording device started working again, at a time when Mr. Barnes was falsely confessing to murder and implicating others, two of whom are actually innocent. There is no recording of the time when Mr. Barnes switched from maintaining his innocence to confessing to murder. Mr. Barnes gave this false confession—which then formed the basis for his later trial testimony—because, after asserting his innocence for so long, the PCSO investigators wore him down. Through the investigators' presentation of false evidence implicating Mr. Barnes in the crime, he believed they were going to show him to be guilty no matter what the truth was. At the time of the interrogation Mr. Barnes was also high on methamphetamine, and he had not slept in days or even weeks.

PCSO's failure to record the key part of the Barnes interrogation when he switched from maintaining innocence to confessing to murder was not the only supposed "technical" issue that arose during PCSO interviews of crucial witnesses. The first interview with Ms. DePierre was not recorded at all, purportedly because of "problems with the recorder." Then, when PCSO investigators conducted a follow-up interview the next day, it was only partially recorded, purportedly due to technical issues. The first two interviews of Ms. Willson were recorded with no problem. But the PCSO investigator said his recording device malfunctioned for *both days* of the interrogation when Ms. Willson supposedly inculpated Ms. Lyn-Darr.

During the second recorded part of Mr. Barnes's interrogation, he attempted to provide details to his confession. But because he actually had not been present and did not participate in the homicide, he had no idea what had happened. So Mr. Barnes formed his story based on information the PCSO investigators provided him, including pictures they showed him. Contrary to accepted interrogation techniques, PCSO investigators fed Mr. Barnes information throughout the course of the interrogation. This occurred both before and after Mr. Barnes went along with the investigators' theory and said that he had been involved. Once he switched to saying he had been involved, PCSO investigators continued to feed him information to try to make his story conform to the one they wanted. A few examples follow:

- When Mr. Barnes claimed that an attack occurred in one part of the house, PCSO investigators provided him crime-scene pictures showing the bloodletting event to get him to change his story to be that the attack happened in that other part of the house.
- When Mr. Barnes did not think there had been anything used to bind the victim's hands or feet, the investigators told him: "Think real hard. Duct tape."

- At one point, Mr. Barnes had suggested trash bags had been brought to remove items stolen from the house, but the investigators knew no trash bags had been found at the scene and no witness reported any items taken from the home being in trash bags, so they quickly told Mr. Barnes that the participants did not put stuff in the bags and got him to say they never used them.

- When Mr. Barnes was asked about the victim's head injury, he did not know what had caused it. He initially guessed that a golf club caused the head injury because, he told PCSO Sergeant John Pannunzio, "you said something about a golf club." He then guessed it could have been a baseball bat. But Sergeant Pannunzio was not satisfied with that answer, suggesting to Mr. Barnes that a broken planter was what had caused the head wound. Mr. Barnes then adopted that theory, much to the obvious satisfaction of the investigators.

- The investigators also told Mr. Barnes that the body had been burned and that an accelerant had been used. In fact, they ultimately provided Mr. Barnes not just with the information that an accelerant had been used but also the specific type of accelerant:

  DET. PANNUNZIO: Do you know what they burned him with?

  MATTHEW BARNES: No, I've not been told that information yet.

  DET. PANNUNZIO: Put some Thompson's Water Seal on him.

- PCSO investigators told Mr. Barnes what had been taken from the home, which Mr. Barnes then parroted back. For instance, investigators told him that sports memorabilia had been taken. They then went further to tell him what specific team's memorabilia had been taken.

- Investigators additionally fed Mr. Barnes information that Ms. Lyn-Darr had blood on her. During the first recorded portion of the interrogation, Mr. Barnes was adamant he had never seen blood on Ms. Lyn-Darr. When asked during the second portion about blood on Ms. Lyn-Darr, Mr. Barnes's response demonstrated that the information had already been provided to him during the unrecorded portion:

  DET. PANNUNZIO: Where was the blood on her?

  MATTHEW BARNES: All over her, *like you said*, just basically her t-shirt and her pants. Her knee.

  DET. PANNUNZIO: Knee and her pants.

  MATTHEW BARNES: Her shoes.

(Emphasis added.)

Throughout the second portion of the interrogation, Mr. Barnes would consistently guess at information, look to the investigators to see if they were satisfied with his answers, and then try to give them more. As the District Attorney acknowledged in 2024, police fed Mr. Barnes information, and then he expanded on it:

> On retrial, the jury would need to watch the interrogation of Barnes, which took place over an approximate 8 hour period. The jury would need to compare hours of Barnes asserting he was never at the murder scene and repeatedly requesting a polygraph, with his eventual confession, made after a significant gap in the recording (reportedly due to technical difficulties), that he was present as a look-out, and his ultimate confession, in the final minutes of the interrogation, that he struck the victim in the head with a planter.
>
> . . .
>
> With or without testimony from a false confession expert, the jury would need to consider whether the circumstances of the interrogation, including law enforcement lying to Barnes about co-defendants' pointing the finger at him, and bluffing that shoe evidence placed him at the scene, could lead Barnes to falsely confess to his presence and participation during the murder.
>
> . . . The jury would need to consider that Barnes['s] confession contained some demonstrably false facts when he expanded on facts provided to him by law enforcement. These false expansions of provided facts included: The perpetrators brought walkie talkies with them (the walkie talkies at the scene belonged to the victim); Barnes used one of the walkie talkies to monitor police radio traffic (the walkie talkies did not have that capability); The "planter" "vase thing" Barnes used to strike the victim was "terra cotta like, ceramic, kind of like a clay" (it was plastic); The accelerant looked like a gallon plastic jug of antifreeze (it was a rectangular metal can of Thompsons Water Seal); The victim screamed in pain after being set on fire (the victim was deceased at the time his body was set on fire).

People's Prop. Find., ¶¶ 18, 23-24.

The PCSO investigators formed the narrative they wanted to present and then shaped the evidence to fit it. If a witness or suspect gave them information that ran counter to their narrative, the investigators cajoled, threatened, or coerced witnesses and suspects until they got evidence to fit what they claimed happened. This testimony then formed the foundation for Ms. Lyn-Darr's convictions at her trial in February 2012. The two most important witnesses against her were Mr. Barnes and Ms. Willson. At trial, Mr. Barnes parroted his false confession as best he could. He restated the information PCSO investigators had fed him. When he could not remember something, prosecutors used the interrogation to refresh his memory or impeached him with the testimony of the PCSO investigators. Ms. Willson testified to practically nothing purportedly contained in the January 2010 interrogations. Thus, the PCSO investigator impeachment

testimony served as the substantive testimony. Without this fabricated evidence Ms. Lyn-Darr would not have been convicted and would not have spent more than a decade in prison for crimes she did not commit.

Because of the coerced and fabricated evidence produced by PCSO, Ms. Lyn-Darr was convicted of, *inter alia*, first-degree murder and sentenced to life in prison without the possibility of parole. Ms. Lyn-Darr served until 2025 in a men's prison. As a transgender woman, this was harsher than imprisonment for men serving in men's prisons.

In 2019, counsel for Ms. Lyn-Darr interviewed Mr. Barnes, who admitted that his confession and his concomitant testimony were false. Thus, in March of 2020, Ms. Lyn-Darr filed a Petition to vacate her convictions. Ms. Lyn-Darr supplemented that Petition over the following years as more evidence of her innocence emerged. The first supplement was filed in October 2020 and included a letter Mr. Barnes wrote to his own attorney in August 2010, stating that his confession was false and that if he testified consistent with that letter, everyone would know he was lying. The second supplement, filed in December 2020, pointed to statements by the prosecution and the trial court in Mr. Barnes's case highlighting the critical importance of Mr. Barnes's testimony to Ms. Lyn-Darr's convictions. The third supplement was filed in March of 2022 and addressed an interview Ms. Lyn-Darr's counsel conducted with Mr. Wilkerson in the presence of Mr. Wilkerson's own attorney. In this interview, Mr. Wilkerson stated unequivocally that Ms. Lyn-Darr is innocent and had nothing to do with the burglary and homicide. Shortly after this filing, counsel for Ms. Lyn-Darr contacted then-District Attorney J.E. Chostner to ensure he was aware of the information demonstrating Ms. Lyn-Darr's innocence and asking that he review the case and have a discussion with defense counsel. D.A. Chostner did not respond to Ms. Lyn-Darr's counsel, instead apparently instructing his deputies on the case to continue to fight Ms. Lyn-Darr's exoneration. The fourth supplement was filed in October 2024 and discussed a letter Mr. Barnes wrote to the court hearing the Crim. P. 35(c) Petition, which stated unequivocally that his confession and testimony were false.

Despite all the powerful and clear evidence that Ms. Lyn-Darr had been wrongfully convicted, two 10th Judicial District Deputy District Attorneys—Chief Trial Deputy District Attorney Jeffrey Lindsey and Deputy District Attorney Marguerite Bischoff—worked in tandem and in the name of and with the apparent blessing of then-D.A. Chostner to do everything they could to prevent Ms. Lyn-Darr from receiving justice and having her convictions overturned. Their attempts to obstruct Ms. Lyn-Darr's efforts at justice included taking blatantly unconstitutional actions like threatening to revoke Mr. Barnes's plea agreement to keep him from testifying to the truth in Ms. Lyn-Darr's Crim. P. 35(c) proceedings. Mr. Lindsey, with Ms. Bischoff's acquiescence, also repeatedly threatened to charge Mr. Barnes with perjury relating to his 2012 testimony *if* he should testify in the Crim. P. 35(c) proceedings in any way that was different from his trial testimony. This was nothing more than an unconstitutional effort to stop a defense witness from speaking the truth. Mr. Lindsey said unequivocally that Mr. Barnes was "on the hook" for his prior testimony and the prosecution would withdraw his plea agreement if Mr. Barnes should testify differently. Even when Mr. Barnes's own counsel said he would answer a question and did not intend to assert a claim of privilege, Mr. Lindsey countered that, arguing that Barnes did in fact have a privilege. This advocacy caused Mr. Barnes's lawyer to change the advice she provided and caused Mr. Barnes to refuse to answer. Mr. Lindsey went so

far as to assert, with Mr. Barnes on the witness stand, that if Mr. Barnes so much as answered a question about whether Ms. Lyn-Darr's counsel had offered him anything to say his confession or prior testimony was false, "then all bets are off."

Then on September 24, 2024, Mr. Lindsey filed something so full of falsehoods that his successor, Senior Deputy District Attorney G. James Poland, expressly disavowed the filing. In fact, Mr. Lindsey's filing was so full of falsehoods that Mr. Poland took it on himself to file a subsequent document correcting much of what Mr. Lindsey told the court. Mr. Lindsey's filing was prompted by a request from the court to file something outlining the physical evidence that placed Mr. Barnes at the scene of the homicide. There being no such evidence, Mr. Lindsey filed something titled, "People's Theory of Matthew Barnes' Involvement in the Robbery and Homicide of Robert Piserchio." This "Theory" was so rife with distortions of the evidence and outright falsehoods that Ms. Lyn-Darr's counsel offered Mr. Lindsey and Ms. Bischoff an opportunity to withdraw it. They refused, doubling down and telling Ms. Lyn-Darr's counsel that if he had read discovery, then he would know nothing in the filing was false or misleading. That, too, was untrue. The District Attorney defendants' actions resulted in Ms. Lyn-Darr being incarcerated an extra five years once clear evidence came to light that she had been wrongfully convicted. The District Attorney defendants used unlawful and unconstitutional means to prolong these wrongful convictions.

It was only after Mr. Lindsey and Ms. Bischoff left the case that Ms. Lyn-Darr was able to obtain justice. In December 2024, with Mr. Poland now helming the case and a new District Attorney on her way into office, the District Attorney's Office filed Proposed Findings of Fact in which it essentially conceded Ms. Lyn-Darr's claim for a new trial based on newly discovered evidence. In February 2025, the district court granted Ms. Lyn-Darr's Crim. P. 35(c) Petition and vacated her convictions. On May 20, 2025, the District Attorney's Office moved to dismiss the charges against Ms. Lyn-Darr, and that motion was granted the same day.

Counsel intend to bring a variety of legal claims on behalf of Ms. Lyn-Darr, which may include but are not limited to: claims of unreasonable seizure/arrest without probable cause; willful and wanton tortious conduct; malicious prosecution; destruction and/or hiding of exculpatory evidence; manufacture of inculpatory evidence; false imprisonment; abuse of process; and intentional infliction of emotional distress.

## Names of Public Employees

Defendants in this suit may include but are not limited to:

Jeremy Bacor
Pueblo County Sheriff's Office

David Clements
Pueblo County Sheriff's Office

Leide DeFusco
Pueblo County Sheriff's Office

Troy Kochevar
Pueblo County Sheriff's Office

Don Leach
Pueblo County Sheriff's Office

Leroy Mora
Pueblo County Sheriff's Office

John Pannunzio
Pueblo County Sheriff's Office

Kirk M. Taylor
Pueblo County Sheriff's Office

Ronald Thurston
Pueblo County Sheriff's Office

J.C. Williams
Pueblo County Sheriff's Office

J.E. Chostner
10th Judicial District Attorney's Office

Jeffrey D. Lindsey
10th Judicial District Attorney's Office

Marguerite Bischoff
10th Judicial District Attorney's Office

## NATURE AND EXTENT OF INJURIES, DAMAGES, AND LOSSES

Defendants' treatment of Ms. Lyn-Darr robbed her of more than a decade of liberty and violated her most sacred and constitutionally protected civil rights. Because of defendants' actions, Ms. Lyn-Darr was housed in a men's prison and not released until February 2025, and she remained on bond until the case was finally dismissed in May 2025. Defendants' conduct caused significant injury and damage to Ms. Lyn-Darr. Ms. Lyn-Darr is seeking damages for both economic and non-economic losses.

## MONETARY DAMAGES CLAIMED

While the exact amount of damages will be determined at trial, Ms. Lyn-Darr will seek the maximum amount of damages and remedies permitted by law. She will also seek attorneys' fees and costs.

Sincerely,

*s/ Eric K. Klein*
Eric K. Klein
Gail K. Johnson

*Counsel for Acacia Lyn-Darr*

cc: Acacia Lyn-Darr